# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 19-CR-10080 |
| | ) | |
| ELIZABETH HENRIQUEZ, | ) | LEAVE TO FILE GRANTED ON |
| | ) | MARCH 26, 2020 |
| Defendant. | ) | |

## ELIZABETH HENRIQUEZ'S SENTENCING MEMORANDUM

Elizabeth Henriquez stands humbly before this Court an emotionally and spiritually broken woman. Elizabeth is ashamed and embarrassed by her conduct, remorseful for the pain she has caused others known and unknown, anguished by the hurt and scorn to which she has exposed her daughters ▮▮▮▮▮▮▮, and fearful of what her uncertain future holds. Mostly shunned by her friends and neighbors, Elizabeth has been forced to confront demons that have haunted her for decades; to reconcile her criminal conduct with the core values she had tried to instill in her daughters; and to comprehend why her deep, unconditional love for her daughters warped itself into cheating the college admissions system for them. *See, e.g.*, Letter of Elizabeth Henriquez, at 1, 3 ("This past year has felt never-ending and tormenting at times. I am preoccupied by the question: was I a good mother? And how can I be a good mother going forward? I know that I failed in some very basic ways. I will spend the rest of my life trying to understand why, as well as trying to make up for it. . . . I feel immense shame for lying to my family, friends, and community and for not considering the impact my actions would have on honest students. I apologize to those

families for the hurt I have caused them.").[1]  Elizabeth understands that her unconscionable choices have left a permanent stain on the story of her life.  Elizabeth wishes to begin serving out her sentence as soon as practicable, so that she finally can turn to the next chapters of her life—the chapters where she can seek to repay through service the communities that she stole from and people that she hurt, and where she can try to repair the family that her conduct has torn apart.

Last month, we were prepared to recommend that the Court impose on Elizabeth the same sentence that the Court imposed on Michelle Janavs, whose offense conduct was materially identical to Elizabeth's.  Over the past month, however, two critical things have changed.  First, evidence that the government has disclosed over the past few weeks confirms that Rick Singer initially lured Elizabeth into his criminal web by convincing her to make a charitable donation to the Georgetown Tennis program, in exchange for Coach Ernst agreeing to use his influence with the university's admissions committee on Elizabeth's daughter's behalf.  The government agrees that Elizabeth's understanding at all times was that the $400,000 donation was going entirely to the Georgetown Tennis program's institutional account, rather than into the personal pocket of a corrupt coach or university administrator—a circumstance that distinguishes Elizabeth from many other indicted parents, including parents that this Court already has sentenced.  Indeed, Singer led

---

[1] We have provided the Court with letters from Elizabeth, her brothers, her sister-in-law, several friends, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, we are filing them under seal as Exhibits 7-a – 7-n.

Elizabeth to believe that this arrangement was not only completely legitimate, but the way that non-revenue college sports programs raised the outside funds that they need to operate.[2]

Second, the unprecedented and unexpected COVID-19 crisis has thrown into serious question whether a defendant like Elizabeth—a non-violent, first-time offender in her late 50s and with underlying health conditions, and whose applicable Sentencing Guidelines range as calculated under §§ 2B1.1 and 2S1.1 places in her "Zone A" of the sentencing table—should be incarcerated, when probation with a condition of home detention is a statutorily available alternative.  As detailed further below, placing Elizabeth into the federal prison population at the present time presents significant health risks, and we respectfully submit that it would be inconsistent with 18 U.S.C. § 3553(a) for the Court to sentence Elizabeth to a term of incarceration with an indefinite reporting date.  Instead, under the present public health emergency, we think it would be most consistent with § 3553(a) for the Court to impose on Elizabeth a sentence that she can begin serving out immediately without undue risk to her health.  In fact, on March 26, 2020, Attorney General William Barr issued a memorandum to the Director of the Bureau of Prisons ("BOP") to express that "at-risk inmates who are non-violent and pose minimal likelihood of recidivism" would be "safer serving their sentences in home confinement rather than in BOP facilities."  The Attorney General stated that the BOP should "ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody."  Here, it would be equally appropriate for this Court sentence Elizabeth to probation with a condition of home detention in the first instance.

---

[2] It was not until four months after agreeing to make the charitable donation that Elizabeth learned facts suggesting that Singer and Coach Ernst may be planning to misrepresent her daughter as some sort of tennis program recruit.  Elizabeth did not participate in the creation of a fake athletic profile for her daughter, further distinguishing her from others who have already been sentenced.

Accordingly, and for the reasons set forth below, we ask that the Court sentence Elizabeth to (1) thirty months' probation, the first five months of which shall be subject to a condition of home detention;[3] (2) a within Guidelines fine; and (3) a substantial requirement of community service.[4]  Letter of ███████████████████████████, at 1 ("I respectfully request that if Elizabeth's sentence includes incarceration, it be done at home.").  If, however, the Court determines that a term of incarceration should be imposed, we request that the term be less than, or at most equal to, the term of incarceration that Michelle Janavs received.[5]

## I.   PRELIMINARY STATEMENT

Elizabeth conspired with Rick Singer to have her older daughter fraudulently admitted to Georgetown University and her younger daughter fraudulently admitted to Northwestern University.  She will be the sixteenth parent to be sentenced in connection with the college admissions scandal.  Like Elizabeth, three of those previously-sentenced parents involved multiple children in Rick Singer's scheme—Michelle Janavs (two children, sentenced to five months' imprisonment), Toby MacFarlane (two children, sentenced to six months' imprisonment), and Douglas Hodge (five children, sentenced to nine months' imprisonment).  Contrary to what the government's consolidated sentencing memorandum implies, and as we explain more fully herein, Elizabeth cannot rationally or reasonably be branded as the most culpable parent-defendant to

---

[3] The balance of the thirty months of probation (*i.e.*, twenty-five months) would be in lieu of the supervised release that would typically follow a period of incarceration.

[4] If the Court agrees with our home detention proposal, we think it would be appropriate for Elizabeth's community service obligation to be significantly more onerous than the Court has imposed on any other defendant in this case.

[5] If the Court imposes a term of incarceration, we ask that the Court take into consideration the high likelihood that, as a COVID-19 precautionary measure, the Bureau of Prisons will prohibit social visits to prisoners for the foreseeable future.  Even if Elizabeth's physical health can be guaranteed at a federal prison camp, she may be denied any opportunity to see her family, including her two college-aged daughters, for the entire duration of her sentence.

stand for sentencing before this Court, nor as the parent-defendant whose conduct is deserving of the harshest sentence to date.

To the contrary, Elizabeth's offense conduct is clearly and significantly less aggravated for sentencing purposes than that of Mr. Hodge, the former CEO of one the world's most sophisticated investment companies who, over the course of a decade, succeeded in securing fraudulent admissions for *four children*—and unsuccessfully tried to do so for a *fifth child*—and was sentenced to nine months' imprisonment.[6]   Instead, Elizabeth's offense conduct most closely resembles that of Michelle Janavs, whom this Court deemed clearly less culpable than Mr. Hodge and who received a sentence of five months' incarceration.   Indeed, viewed through the lens of U.S.S.G. § 2B1.1's Application Note 21(A)(i), as this Court has deemed appropriate, Elizabeth's offense conduct is *identical* to that of Ms. Janavs—both women sought to accomplish the *exact same* non-monetary objective of fraudulently securing a college admission for two children.   And to the extent the Court deems it relevant for sentencing purposes, both Elizabeth and Ms. Janavs utilized the same instrumentalities to accomplish this identical objective—test cheating and a "side door" for one child, and test cheating alone for the other.

Elizabeth makes no excuses for her criminal conduct.   But she is not the spoiled, self-entitled, disdainful woman that the government has portrayed her to be.   The government has sought to paint Elizabeth as a cynical Silicon Valley socialite whose insatiable desire for prestige drove her to do anything—even engage in a criminal conspiracy—to procure trophy diplomas for her daughters.   That caricature is not remotely who Elizabeth is, and a desire for prestige is

---

[6] We recognize that the Court gave Mr. Hodge an unspecified "discount" for his philanthropic work.   *See* Transcript of Sentencing Hearing at 64:18–21, *United States v. Hodge*, No. 19-cr-10080-NMG (D. Mass Feb. 7, 2020), Dkt. 840 ("Hodge Sentencing Hr'g") ("I would be imposing a prison sentence of more than one year.   Your prior philanthropy and good works have earned you a discount.").

absolutely not why Elizabeth engaged in the conduct for which she finds herself before the Court.

Elizabeth is a fundamentally decent, kind woman who 

dedicated nearly her entire adult life to being the loving

and protective mother that she herself lacked; and, in the midst of a painful seven-year

estrangement from her parents and siblings, lost her moral compass, forgot what true parental love

means, and joined into Rick Singer's scheme.  *See* Letter of

("During [Elizabeth's] estrangement [from our family], I missed [her] and worried

about her.  I hoped she was okay, but doubted that she was . . . I don't think [Elizabeth] was ever

happy [in Silicon Valley], never truly fit in, and that these problems were only more acute during

our many years of separation."); Letter of

Elizabeth unequivocally accepts full responsibility for her conduct.  The guilt and shame

that Elizabeth feels over her conduct is plain for anyone to see.  *See* Letter of Jill Schwab

(Elizabeth's sister-in-law), at 2 ("[Elizabeth] is already punishing herself more for blowing apart

her family than any imposed fine or prison sentence can punish her.  She has repeatedly expressed

remorse to me about the decisions she made and the actions she took . . . ."); Letter of

Elizabeth is prepared for whatever punishment the Court determines to

be fair and just.  At the same time, Elizabeth hopes that the Court may see her for who she truly

is, and not just for who she was at her worst moments; she pleads that the Court show her the same

compassion and understanding that it has shown other parent-defendants.

For the reasons set forth below, and in light of Elizabeth's ████████ ████████, we respectfully request that, in lieu of incarceration, the Court impose a sentence of thirty months' probation, the first five months of which shall be subject to a condition of home detention; a criminal fine within the recommended Sentencing Guidelines range; and a substantial requirement of community service.

## II.    ELIZABETH'S PERSONAL BACKGROUND

Elizabeth is a native of Westwood, Massachusetts.  She is a "displaced New Englander[ ] living in Silicon Valley," ████████ ████████ Letter of Rebecca Friend (Elizabeth's close friend), at 1.  With her "down to earth Boston values," Elizabeth has "struggled to fit in to the wealthy Atherton, West-Coast scene."  *Id.* at 2.  Living "*in* Silicon Valley, but not *of* it," Elizabeth feels most herself "wearing a Patriots hoodie, listening to Boston sports radio . . . , feeding the cats, making chicken soup, and needlepointing." ████████ Having given up her professional career, and uncomfortable participating in the cocktail-party charity circuit so popular among the wives of the Silicon Valley elite, Elizabeth instead dove heart-first into the single hardest, most important, and most unsung job of all—being a mother.  Elizabeth's husband Manuel always has been the sole bread winner of the family, and Elizabeth is "grateful that [Manuel's business] success provided [her the] luxury" of providing her daughters the type of committed, caring mother that Elizabeth herself sadly lacked.  Letter of Elizabeth Henriquez, at 1.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████  Elizabeth raised her

daughters with "compassion," "commitment," and "love and devotion."  Letter of Michelle

Dillabough (Elizabeth's friend), at 1.

Since giving birth to ████████████, Elizabeth's "main desire in life [has been] to make

sure she [is] a good mother, to be better to her two girls than her mother was to her, to be her

daughters' friend." ██████████████████.  A stay-at-home mother's contribution to the

family rarely receives fanfare, and that was true for Elizabeth.  But fanfare is not what Elizabeth

sought.  Elizabeth dedicated herself to the little things that, in the end, really are the big things—

volunteering at her daughters' school, shepherding them to their sports practices, helping them

with their homework, attending all of their sporting events and dance recitals, and providing a

shoulder to cry on and warm embrace to fall into whenever they needed it.  *See* Letter of Rebecca

Friend, at 2 ("[Elizabeth] did not pass her girls off to a nanny and chef but instead remained hands

on.  She stayed home with her girls, drove to the after-school activities and cooked dinner every

night. . . .  She showed up for her girls every day with an open heart."); Letter of Jill Schwab, at 1

("[S]he viewed her job as raising her daughters and staying involved in their education and extra-

curricular activities.  I remember admiring Liz when . . . she had helped out in the girls' classrooms

for Valentine's Day parties or bake sales."); Letter of ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Manuel's business success provided the Henriquez family with comforts and other advantages that very few in America ever obtain.



███████████████████████████████████████████████████████

██

      As ████████████████ have become young adults, naturally they have grown less

dependent on Elizabeth. ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████

      ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

Elizabeth's quiet, unsung kindness and generosity has extended beyond her nuclear family.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

Elizabeth is there for her friends during their darkest hours.   ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██

The depths of Elizabeth's kind soul, and her capacity for redemption, may have been best revealed by ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

## III.    ELIZABETH'S CRIMINAL CONDUCT

The parents who have been sentenced to date in connection with the college admissions scandal fall into two camps—those who knowingly and purposefully hired Rick Singer to perpetrate a fraud; and those who hired him to provide legitimate college counseling services, initially unaware of the schemes on which he ultimately would sell them.  Elizabeth indisputably falls into the latter camp.

In June 2014, Elizabeth hired Rick Singer to be the college counselor for ████████████ had recently completed her sophomore year of high school, and Elizabeth hoped that a college counselor could help ████████████████████████████████████████ ███████████████████████████ Elizabeth did not enter the relationship knowing that Singer was a fraudster, nor did she force Singer on ██████  One of Elizabeth's most trustworthy friends recommended Singer.[10]  Elizabeth had ██████ meet with Singer and at least one other counselor, so that ██████ could choose whom *she* liked best.  Singer showed up to his introductory meeting with ██████ wearing athletic gear emblazoned with the Iron Man Triathlon logo, spoke about his triathlon and other athletic achievements, and boasted about how he provided

---

[10] There is no evidence whatsoever that this friend engaged in Singer's scheme or even knew such a scheme existed.  As evidenced by the number of parents not charged in this case who paid Rick Singer for his services, Singer was careful not to reveal his schemes to a parent whom he believed he could not persuade to engage in them.

college counseling services to all of the elite families in Silicon Valley.[11]  Elizabeth asked ███

which counselor she liked best.  The master salesman, Singer sold ███ with his high-octane,

energetic, "can do" sales pitch.  ███ told Elizabeth that she "wanted Rick, definitely Rick."

Introducing herself to Singer via email on June 1, 2014, Elizabeth described herself as

"very low key and not into high pressure on our kids."  Exhibit 1.  She explained that ███

████████████████████████████████████████████████████████████

████████████████████████████████  *Id.  For nearly*

*a year*, Singer provided ███ wholly legitimate counseling and tutoring services in exchange

for a fixed fee.  Singer and his associates helped ███ prepare for standardized tests, select and

study for high school classes, and choose potential colleges.  On her own initiative, ███ spent

almost all of her free time studying.

With routine access to Elizabeth, ███ and the Henriquez home, at least two things

would have become apparent to Singer soon after Elizabeth hired him.  First, Elizabeth dreaded

the thought of ███ experiencing any more school-related disappointment.  Second, the

Henriquezes had money.  Singer pounced.  In February 2015, Singer set up tours for Elizabeth and

███ of several colleges on the east coast.  Singer insisted that Georgetown University be one

of them, rebuffing Elizabeth's concerns that it was unrealistic given ███ high school grades

and standardized test scores (which were good but not great).  Unbeknownst to Elizabeth, Singer

specially arranged for ███ Georgetown tour to be conducted by an outgoing, good-looking

sophomore named ███████, a former Singer client who was serving as the manager of the

---

[11] Singer was nothing if not a highly skilled liar and master manipulator.  In one Title III phone
call that the government disclosed to the defense, Singer told a parent that he had served as LeBron
James's AAU basketball coach, was an assistant coach to Bobby Knight at Indiana University, and
had become a "surrogate big brother" to Steve Jobs's son while Jobs was dying of pancreatic
cancer.  All of these claims are demonstrably false.

Georgetown Tennis Team.  Presumably at Singer's specific direction, ██████ repeatedly talked up Gordon Ernst, Head Coach of Georgetown's men's and women's tennis teams.  ██████ told Elizabeth and ██████ that Coach Ernst was "the greatest guy" and that they had to meet him.[12] ██████ also repeatedly talked about how Singer got him his team manager job.  To Elizabeth's dismay, by the end of the tour, ██████ had fallen in love with Georgetown.

After returning to California, Elizabeth expressed to Singer her concern that the Georgetown tour had simply set ██████ up for deep disappointment.  Singer knew then he had his mark—a lonely, insecure, over-protective stay-at-home mother with access to money.  Singer told Elizabeth that, given ████████████████ he was the only one who could secure ██████ a spot at a good university.  Elizabeth was eager to learn more.  Having already deployed ██████ as his unwitting set-up man, Singer revealed to Elizabeth in April 2015 that he had developed a tried-and-true method for securing admission to top universities, one that he had used hundreds of times at dozens of schools across the country for the children of well-to-do families over the years.  Singer called it the "side door."  Singer told Elizabeth that in exchange for a $400,000 donation to the Georgetown Tennis program, which at that time was severely underfunded and reliant upon private donors, Coach Ernst would be willing to allocate to ██████ one of the "slots" that he received each year from the admissions department.  Singer assured Elizabeth that this sort of thing was completely legitimate—the way that all Division I non-revenue sports programs raised

---

money.[13]   Hearing this, Elizabeth was sold on Singer's charitable contribution proposal.   For Elizabeth and her husband Manuel,  all the more searing to watch, making a large, ostensibly legitimate donation to the Georgetown Tennis program seemed to be a small price to pay for ███ happiness.

Elizabeth should have rejected out of hand any suggestion that the Henriquez family use its wealth to give ███ any additional leg up in the college admissions process.  Elizabeth should have suspected something highly unethical was afoot when four months later, on August 19, 2015, Singer instructed her to have ███ send an email to Coach Ernst stating that ███ had "been really successful this summer playing tennis around the country" and was "looking forward to having a chance to be a part of the Georgetown Tennis team and make a positive contribution to your team's success."  Exhibit 3.  And when Singer then stated to Elizabeth two weeks later that he was "going to change things" in ███ Georgetown application essay "to talk about tennis," PSR, ¶ 64, Elizabeth should have disengaged and sounded the alarm.  But she did not.  Instead, Elizabeth chose of her own free will to ask no questions and to continue to play along with Singer's scheme, not raising even with her husband Manuel her concerns that Singer may be lacing

---

[13] Singer's conversation with Elizabeth was oral and unrecorded, but the government has disclosed to the defense a number of emails and Title III recordings where Singer provides this explanation to parents.  *See, e.g.*, Exhibit 2 (Singer writing to a parent that the "side door is not improper nor is [the] backdoor[,] both are how all schools fund their special programs or needs").  The government does not contest that Singer reeled Elizabeth in by making such false assurances.

████ Georgetown application with lies.[14]  And when Singer told Elizabeth that her charitable

donation to the Georgetown Tennis program was not itself a guarantee of admission, and that she

also needed to pay him a large sum of money to secure fraudulent standardized test scores for

████—including scores for SAT II tests that Georgetown *did not even require applicants to*

*take*—Elizabeth agreed and paid Singer whatever he asked.[15]

Elizabeth knew that what she was doing was wrong.  She was not proud; she was ashamed,

hiding her conduct even from ██████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████ Elizabeth knew in

her heart that cheating and bribing for ████ "benefit" was not a true, let alone legal, way of

expressing her deep, unconditional, abiding parental love.  Elizabeth knows that there is no excuse

for her decision to knowingly participate in Singer's test cheating scheme.  Her decision was not

merely immoral and unfair to all of the honest students who dreamt of going to Georgetown too,

it was criminal.

After securing ████ admission to Georgetown, Singer wasted little time before

preying on Elizabeth's anxiety about her second daughter's future.  When it was time for her

---

[14] The personal essay that Singer altered did not simply "talk about tennis."  Rather, the essay and application that Singer put together were laden with highly detailed false statements.  Notably, Singer *did not* send Elizabeth a copy of this fraudulent essay included in ████ eventual application (either before or after Singer submitted it to Georgetown), and we are not aware of any evidence that Elizabeth ever saw it.  Still, Elizabeth knew that the application included materially untruthful information.

[15] It is undisputed that ████ had legitimately obtained an SAT score of 1580 (out of 2400) in March 2015, which was the 61st percentile.  Georgetown does not require students to submit any SAT II scores as part of their application packages.  *See* https://uadmissions.georgetown.edu/applying/preparation-process/.

younger daughter ███ to begin preparing for the college application process, Elizabeth lacked the fortitude to right the ship. As he had done with ████ Singer carefully orchestrated a plan to get ████ enamored with a school to which Elizabeth did not believe ████ could gain admission legitimately. This time, it was Northwestern University, which nobody in the Henriquez family had expressed any interest in until Singer raised it as the ideal place for ████ As he did with ████ tour of Georgetown, Singer specially arranged to have another one of his former students (*i.e.*, a "Singer kid"), a charming young man like ████████, shepherd ████ around campus. ████ was instantly hooked.

████████████████████ had always done exceptionally well academically. She was essentially a straight-A student, had amassed a list of extracurricular activities that most teenagers would envy, and legitimately had knocked her Advanced Placement exams out of the park. In April 2016, Elizabeth told Singer that she "need[ed] to get ████ motivated to prep for [her standardized] tests," Exhibit 4, suggesting that Elizabeth was not at that time planning to pursue the fraudulent path for ████ *See also* Exhibit 5 (Elizabeth asking Singer on April 25, 2016, whether he had "any other tutors for ████ to use for SAT prep"). Confident in her daughter's abilities, Elizabeth registered ████ to take the ACT legitimately in September 2016. *See* Exhibit 6, at 2 (August 31, 2016 email from Dana Jordan).

Singer, however, bluntly told Elizabeth that ████ was too stupid to obtain an acceptable ACT score on her own, that ████ should not even *attempt* to take the ACT legitimately, that Elizabeth should cancel the September test, and that Elizabeth should pay Singer $75,000 to obtain

fraudulent test scores for ███.[16]   As Singer had groomed her to do, Elizabeth did as Singer

advised.[17]   *See* Exhibit 6 (September 13, 2016 email exchange with Dana Jordan).   Over the next

several months, Singer arranged to have ███ sit for two fraudulent ACT exams (only one of

which was submitted as part of a college application) and one fraudulent SAT II exam.[18]   Elizabeth

should have put her foot down.   She should have resisted.   She should have said no.   But she did

not.   Instead, she participated in Singer's scheme again, paying Singer whatever price he quoted.

The world knows how the story ends.   Elizabeth and her husband were arrested on March

12, 2019; ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ and Elizabeth has been trying to pick up the pieces

and repair her family ever since.   This is the woman who stands before Your Honor.

## IV.   SENTENCING GUIDELINES ANALYSIS

Section 3553(a) of Title 18 of the United States Code exhaustively specifies the factors that

the Court must consider in imposing a sentence.   Section 3553(a), however, "is more than a laundry

---

[16] Preying upon Elizabeth's insecurities clearly was Singer's tactic to enrich himself.   In anticipation of Elizabeth's sentencing, the government disclosed to the defense that, during one of Singer's first proffer sessions with the government, he told the prosecutors that ███ did not actually need to cheat on her standardized exams "because she is very smart."

[17] Singer groomed ███ as well, including by berating her as unintelligent, immature, and inadequate.   When ███ wrote a heartfelt application essay about her interest in humanity and religion, Singer refused to let her submit it.   Instead, Singer required ███ to acquiesce to whatever essay Singer and his staff would write for her.   Singer also demanded (and received) login credentials for ███ email accounts, high school grade portals, and "Common App" accounts.   Elizabeth now painfully recognizes that Singer's control of her daughters' lives was psychologically abusive.   She is disgusted that she allowed her daughters to be subjected to this.

[18] ███ SAT II exam comprised three different subject tests.   The government agrees that ███ scores of 770 and 740 on the World History and Spanish Reading subject tests, respectively, were wholly legitimate and unaided by any cheating.   Northwestern University neither requires nor encourages students to submit SAT II scores as part of their general application packages.   *See* https://admissions.northwestern.edu/faqs/high-school-courses/.

list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle.   That tenet (sometimes referred to as the 'parsimony principle') instructs district courts to 'impose a sentence sufficient, *but not greater than necessary*,' to accomplish the goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (emphasis added; quoting 18 U.S.C. § 3553(a)).   Ultimately, a district court "should . . . consider all of the relevant [§ 3553(a)] factors as a group and strive to construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

Post-*Booker*, the Supreme Court has directed that a district court should begin its § 3553(a) analysis by correctly calculating the defendant's non-binding Sentencing Guidelines range.   *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 49 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").   In prior sentencings in this college admissions scandal, the Court, prior to imposing any upward departures, has agreed with and adopted the Probation Office's offense level calculation, overruling the government's objections.   Here, the Probation Office has calculated Elizabeth's offense level as 6, which, given Elizabeth's criminal history score of 0, yields an advisory Guidelines range of 0-6 months' incarceration (Zone A).   We assume that the Court will adhere to its prior findings in this regard, and we therefore adopt the Sentencing Guidelines arguments set forth in the sentencing memoranda of Douglas Hodge.   Defendant's Sentencing Memorandum at 20, n.5, *United States v. Hodge*, No. 19-cr-10080-NMG (D. Mass. Jan. 31, 2020), Dkt. 810.

We will spend the balance of this memorandum addressing the following § 3553(a) factors: **(A)** the nature and circumstances of Elizabeth's offense, and specifically whether and the extent to which the Court should impose an upward departure pursuant to U.S.S.G. § 2B1.1's Application Note 21(A)(i); **(B)** Elizabeth's history and characteristics; and **(C)** the need to avoid unwarranted

sentencing disparities, specifically among college admissions scandal parents previously sentenced for essentially identical (or even more aggravated) offense conduct.

### A.      The Nature and Circumstances of Elizabeth's Offense

In assessing the nature and circumstances of Elizabeth's offense conduct, the defense and the government agree on two key points.   First, Elizabeth conspired with Rick Singer to fraudulently secure the admission of her older daughter to Georgetown and her younger daughter to Northwestern.   Second, Elizabeth secured her older daughter's admission to Georgetown by means of test cheating and the "side door," and she secured her younger daughter's admission to Northwestern by means of test cheating only.   Otherwise, the parties differ dramatically on how Elizabeth's culpability relative to other parent-defendants should be measured.

### 1.      Elizabeth's Conduct Is Identical to Michelle Janavs' Conduct Under the Sentencing Guidelines and § 3553(a)(1)

In the government's view, Elizabeth's offense conduct should be measured not by the undisputed *non-monetary objective* that she sought to accomplish—securing college admissions for her two daughters—but rather by the number of standardized tests (five) during which cheating occurred.[19]   *See* Government's Consolidated Sentencing Memorandum at 10, *United States v. Henriquez et al.*, No. 19-cr-10080-NMG (D. Mass. Feb. 3, 2020), Dkt. 816 ("Gov't Consol. Sent. Memo") (stating that Elizabeth "cheated on more standardized tests than any other co-conspirator").   From this the government argues that Elizabeth's offense conduct is more aggravated even than the offense conduct of Douglas Hodge, whom the government has acknowledged "gain[ed] more from Singer's scheme than any other parent charged to date."

---

[19] Cheating occurred on ███ SAT and SAT II tests.  Cheating occurred on ███ ACT and one of her three SAT II subject sections.  Singer also had convinced Elizabeth to have ███ take (and cheat on) the ACT for a second time, after her first sitting yielded a score below that which Singer had promised.  This is how the government arrives at five instances of test cheating, even though only four test scores were submitted to Georgetown and Northwestern, collectively.

Hodge Sentencing Hr'g Tr. 23:20–22, 28:5.   According to the government, Elizabeth's conduct deserves a 10-level upward departure under U.S.S.G. § 2B1.1's Application Note 21(A)(i)—which would result in an infinite increase (on a percentage basis) to the bottom of Elizabeth's advisory Guidelines range, and a 450% increase to the top of her advisory Guidelines range.   The government does not actually say why a *10-level* enhancement is appropriate; instead, the government simply asserts that Elizabeth deserves the same Application Note 21(A)(i) enhancement for her offense conduct as Mr. Hodge and a greater enhancement than Ms. Janavs. Gov. Consol. Sent. Memo, at 18.

The Court should reject the government's proposed approach to comparing the seriousness of Elizabeth's offense conduct to the offense conduct of Mr. Hodge and Ms. Janavs.   The government's newfangled approach myopically focuses on the number of standardized tests that were included in the defendant's cheating.   Neither this Court nor Judge Talwani has deemed that fact material for purposes of sentencing.   Moreover, the government's approach ignores the plain language of Application Note 21(A)(i), which has been this Court's polestar and which the government cites in its consolidated sentencing memorandum.   Application Note 21(A)(i) provides that an upward departure may be warranted where "[a] primary objective of the offense was an aggravating, non-monetary objective."[20]   In sentencing Mr. Hodge and Ms. Janavs, the Court correctly defined the defendant's objective.   In the Court's words, "Mr. Hodge's objective  . . . was to obtain admission to the University of Southern California and Georgetown for four of his children by bribing college administrators to admit students who otherwise would not have been

---

[20] We disagree that Application Note 21(A)(i) applies in the circumstances of this case, and we wish to preserve our objection for the record.   We respect, however, that the Court already has found otherwise in prior sentencings, and we therefore will not spend time in this memorandum arguing our position.   We hereby adopt the arguments set forth in the sentencing memoranda of Ms. Janavs.   Defendant's Sentencing Memorandum at 23, n.7, *United States v. Janavs*, 19-cr-10080-NMG (D. Mass Feb. 20, 2020), Dkt. 862.

admitted." Hodge Sentencing Hr'g Tr. 5:13–17. And the Court defined "Ms. Janavs' objective" as being "to obtain admission to the University of Southern Cal for her [two] daughters by cheating on college entrance examinations and by bribing college administrators to admit students who otherwise would not have been admitted." Transcript of Sentencing Hearing at 6:11–15, *United States v. Janavs*, No. 19-cr-10080-NMG (D. Mass. Feb. 25, 2020) ("Janavs Sentencing Hr'g Tr."). Elizabeth's objective can be described identically to Ms. Janavs's objective; the Court would only need to swap out the words "University of Southern Cal" for the words "Georgetown and Northwestern University."

Neither this Court nor any other judge in this District has engaged in the "test counting" approach that the government's consolidated sentencing memorandum makes the centerpiece of its culpability analysis for Elizabeth. This is for good reason—the government's approach is arbitrary, and counting up the number of cheated-on tests is not a useful proxy for the defendant's culpability. Elizabeth is not somehow a worse offender—a more willing, knowing participant in Singer's scheme—than Michelle Janavs simply because Singer convinced Elizabeth, but apparently not Ms. Janavs, that her children needed to cheat on non-required SAT II subject tests in addition to their required SAT or ACT test. And the fact that Ms. Janavs's children only cheated on their required ACT tests, and not the non-required SAT II tests, does not somehow make Ms. Janavs's conduct somehow less damaging than Elizabeth's conduct, either to our system of higher education or to the hard-working students whose admissions slots Elizabeth stole. In terms of what the Sentencing Guidelines and § 3553(a)(1) demand a sentencing court to focus on, Elizabeth's conduct and Ms. Janavs's conduct should be deemed identical.

Here, the non-monetary objective of Elizabeth's conduct was not for her daughters to achieve a particular SAT, SAT II, or ACT score just for its own sake. Rather, the non-monetary

objective of her conduct was to secure a college admission for two children (Georgetown for her older daughter and Northwestern for her younger daughter). Adhering to the plain language of Application Note 21(A)(i), as the Court did in sentencing Mr. Hodge and Ms. Janavs, there is simply no basis to deem Elizabeth's conduct the most aggravated or culpable of any defendant that has come before the Court for sentencing. Douglas Hodge fraudulently secured the admission of twice as many children as Elizabeth (four vs. two), and he tried (but failed) to fraudulently secure the admission of a fifth. The non-monetary objective of Hodge's offense conduct was, therefore, arguably at least *twice as aggravated* as Elizabeth's. And that is before considering the multiple other indicia of culpability the government emphasized at Mr. Hodge's sentencing hearing—that Mr. Hodge "often took the reins" from Singer, "interact[ed] directly with coaches and administrators that he corrupted," and cut checks directly to Coach Gordon Ernst. Hodge Sentencing Hr'g Tr. 28:23-25. The government agrees that those indicia are completely lacking with respect to Elizabeth's conduct.[21]

In contrast to Mr. Hodge's "[taking] the reins," Elizabeth played a more subservient role in Singer's scheme. Elizabeth realizes that she should never have agreed to Singer's suggestion that she use a substantial charitable donation to give ████ an advantage in the college admissions process. Moreover, Elizabeth clearly should have understood that it was both immoral and illegal for her subsequently to agree to Singer's plan to use bribery and cheating to obtain inflated SAT scores for ████ Unfortunately and regrettably, Elizabeth chose to go along with Singer's plan, even participating in the test cheating scheme again two years later for her younger

---

[21] The government has never offered a consistent methodology for measuring the alleged severity of the conduct at issue. For example, in Ms. Janavs's sentencing hearing, the government insinuated that Ms. Janavs engaged in fraud at a greater "rate" than Mr. Hodge because she "engaged in the scheme three times over 18 months, compared to Hodge's once every two years participation." Janavs Sentencing Hr'g Tr. 15:8-11.

daughter ████ Elizabeth is not shirking responsibility for her actions, and we are not making any excuses for it. ████████████████████████████████████████████ ████████████████████████████████████████ made her ideal prey for Singer, who enriched himself by convincing Elizabeth to pay him hundreds of thousands of dollars to secure admission to universities that, prior to Singer putting them on ███████████████ tour itineraries, neither Elizabeth nor her daughters were even *considering*.

The government's approach to measuring the seriousness of Elizabeth's offense, relative to other parent-defendants in the college admissions scandal, does not withstand scrutiny. Most pointedly, the government's approach is directly contrary to the one it had taken in Judge Talwani's courtroom last year. In Judge Talwani's courtroom, the government agreed that the test-cheating scheme was substantially less aggravated, and thus deserving of significantly less prison time, than the side door scheme. The government's position was reflected both in the government's sentencing recommendations and the sentences that Judge Talwani ultimately imposed. For parents who only engaged in the test-cheating scheme, the *most time* in prison that the government recommended was nine months' imprisonment (Greg and Marcia Abbott, who arranged for cheating on their daughter's ACT and SAT II subject tests), far lower than *the lowest sentence* the government recommended for "side door" conduct. Moreover, Judge Talwani imposed sentences ranging from probation at the lowest (Peter Sartorio) to one-month imprisonment at the highest (Robert Flaxman, Gordon Caplan, and the Abbotts). The punishments that Judge Talwani imposed for test cheating were comparable to what federal courts have imposed in the handful of other test-



cheating scandals that actually have resulted in federal prosecution. *See, e.g.*, *United States v. Hedaithy*, 392 F.3d 580, 609 (3d Cir. 2004) (affirming sentences of probation and fines for individuals convicted of mail fraud and conspiracy to commit mail fraud for role in TOEFL-cheating scheme). Other than as a legally and logically unprincipled excuse to urge the Court to punish Elizabeth more harshly than Michelle Janavs and even Douglas Hodge, the government's consolidated sentencing memorandum makes no effort whatsoever to explain why it is abandoning, in several different ways, the positions on test cheating that it took in Judge Talwani's courtroom.

Under the new sentencing theory that the government asks this Court to embrace, cheating on a single ACT test apparently would be considered identically aggravated, and would warrant an identical sentence, as concocting a fake athletic profile and bribing a coach, contrary to what the government proposed and Judge Talwani decided in the first wave of pleas. Under the government's new sentencing theory, arranging for a single child to cheat on both an SAT test and SAT II subject test (conduct that would result in the theft of a single admissions slot) would be considered identically aggravated, and would warrant an identical sentence, as arranging for two separate children to cheat exclusively on their SAT tests (conduct that would result in the theft of *two* admissions slots). Finally, it appears that under the government's new sentencing theory, which simply counts up the number of cheated-on tests in determining culpability, Elizabeth's offense conduct with respect to her younger daughter ████—namely, agreeing to pay Singer approximately $90,000 in exchange for cheating on two ACT tests and one of the three unnecessary SAT II subject tests—would warrant the same exact punishment as a parent bribing three different coaches at three different schools to fraudulently secure the admission of three different children.

The Court should reject, both as unreasonable under § 3553(a) and as unmoored from any Application Note 21(A)(i) or any other Sentencing Guidelines provision, the government's new sentencing theory. Instead, consistent with the sensible approach it has taken in its three prior sentencings, the Court should conclude that Elizabeth's offense conduct is most comparable, if not identical, to the offense conduct of Michelle Janavs, whom the Court sentenced last month to five months' incarceration. That approach—simple to determine and apply, non-arbitrary, and tethered to the actual language of Application Note 21(A)(i)—ensures that parent-defendants who sought to accomplish essentially identical objectives receive substantially identical sentences of incarceration or home detention.

In urging that the Court impose a harsher punishment on Elizabeth than on any other parent who has pled guilty, the government's February 3, 2020 consolidated sentencing memorandum also inappropriately discounts or ignores two other mitigating factors, in at least one instance in violation of the plain language of the Sentencing Guidelines. Without belaboring the point, we think these mitigating factors are important to explain.

### 2.      Elizabeth Has Fully and Completely Accepted Responsibility

The mitigating factor the government inappropriately discounts is that Elizabeth has accepted responsibility for her criminal conduct, fully and completely. In its sentencing memorandum, the government insinuates that the Court should somehow give less weight to Elizabeth's acceptance of responsibility because she did not plead guilty prior to being indicted, as the parents assigned to Judge Talwani's courtroom had done. The Sentencing Guidelines preclude this as a matter of law. Section 3E1.1(a) specifically addresses what a defendant must do to obtain the two-level mitigation for accepting responsibility—"clearly demonstrate[ ] acceptance of responsibility." Elizabeth plainly has done that. The Guidelines do not allow a district court to

give less mitigating weight simply because the defendant, though having pled guilty before a trial date was set and before even making a single discovery request to the government, did not plead guilty within the first three weeks of her arrest.

The government also fails to apprise this Court that the *government itself* required Elizabeth to satisfy unreasonable conditions in order to be allowed to enter into a plea agreement after arrest but prior to indictment.  After Elizabeth was arrested, the government advised undersigned counsel that it would allow Elizabeth to enter into a plea agreement only if two conditions were satisfied. First, the government would require Elizabeth to agree that her Sentencing Guidelines offense level would be determined by U.S.S.G. § 2B4.1, which would have required undersigned counsel to advise Elizabeth to agree to a Sentencing Guidelines calculation that they firmly (and correctly) believed was legally incorrect.  Second, the government conditioned any plea agreement for Elizabeth on her husband Manuel, whom Elizabeth does not control, also agreeing to plead guilty at the exact same time, on the exact same plea agreement terms, and with the exact same government sentencing recommendation.[23]  That was not right or fair then, and it certainly is not right or fair now for the government to insinuate that Elizabeth was somehow laggard in demonstrating her acceptance of responsibility for her criminal conduct.  Elizabeth's acceptance of responsibility and remorse is unequivocal and unimpeachable.

### 3. Elizabeth and Manuel Promptly Amended Their Tax Returns Upon Learning That Key Worldwide Foundation Was Not Legitimate

The mitigating factor that the government completely ignores is that, in July 2019, Elizabeth and Manuel jointly and proactively amended their 2016 federal and state tax returns to remove the charitable deduction they had taken with respect to their $400,000 donation to The Key

---

[23] We note that the government's February 3, 2020 consolidated sentencing memorandum recommends that Manuel's sentence of incarceration be more than 30% lower than Elizabeth's and his fine $100,000 less.

Worldwide Foundation.  To begin with, Elizabeth's role in preparing the Henriquez family tax returns was the same as her role in every other financial aspect of the Henriquez family—no role whatsoever.  In any event, at the time that the Henriquezes took the deduction, Singer had led Elizabeth to believe, as the government acknowledges, that The Key Worldwide Foundation was a legitimate charity and that the $400,000 would be passed through directly to the Georgetown Tennis program.  Insofar as a donation directly to the Georgetown Tennis program would have qualified for a charitable deduction, it would have been reasonable for Elizabeth to believe that a donation made indirectly to the Georgetown Tennis program through Singer's registered 501(c)(3) foundation should be too.[24]  When it was revealed, however, in the spring of 2019 that The Key Worldwide Foundation was not a legitimate charitable organization and, moreover, had not passed the Henriquezes $400,000 through to the Georgetown Tennis program, Elizabeth and Manuel recognized that their 2016 joint tax return was incorrect, and they promptly amended it.

### B.     The History and Characteristics of Elizabeth

Elizabeth would be the first to admit that she cannot claim the mantle of a great philanthropist.  ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████  Elizabeth's good deeds have been mostly connected to her children, closest friends, and more recently her mother ███████████████.  Elizabeth's good deeds are not the type that win awards, that people carefully catalogue, that are congratulated in newspapers and magazines, or that will someday land her name on the side of a building.  But her good deeds are no less real.

---

[24] This stands in stark contrast to Toby MacFarlane, who disguised his bribe payments with falsified consulting invoices and deducted those payments from his taxes as business expenses. Government's Sentencing Memorandum at 1, *United States v. MacFarlane*, No. 19-cr-10131 (D. Mass. Nov. 8, 2019), Dkt. No. 334.

With the admittedly important exception of the aberrant criminal conduct for which she is now being sentenced, Elizabeth has not just been law abiding, but also a fundamentally good, decent, kind, and loving human being. *See, e.g.*, Letter of Rebecca Friend, at 3 ("I hope that I have been able to describe the deeply loving, caring and selfless friend that I have known Liz to be . . . . Her behavior in this case was aberrant and not the Liz that I have known and loved for 20 years. . . . I believe Liz's life-long actions as an honest, loving person represent her true character."); Letter of L.B. Fishback, at 1 ("Liz is not a selfish person.  Her whole life she has been taking care of her husband, children and now ███████████████████.");  ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████  This is deserving of the Court's recognition and mercy. *See, e.g.*, *United States v. Warner*, 792 F.3d 847, 858 (7th Cir. 2015) (finding below-guidelines sentence based largely on defendant's good character reasonable when defendant displayed "'humanity and concern for the welfare of others' and acted with 'the purest of intentions,' often 'quietly and privately'").

### C.    The Need to Avoid Unwarranted Sentencing Disparities

In determining the length of any period of incarceration or home detention to be imposed on Elizabeth, this Court should treat as benchmarks the sentences already handed down in the college admissions scandal, assessing Elizabeth's relative culpability based on the material facts of her offense conduct (rather than on the total number of standardized tests that her daughters took) and her personal history and characteristics.   It clearly would create an unwarranted sentencing disparity for the Court to sentence Elizabeth to a greater term of incarceration than that which Toby MacFarlane (six months) or Michelle Janavs (five months) received.   Both

MacFarlane and Janavs fraudulently obtained college admissions for two children, paying Singer essentially the same amount of money as Elizabeth did.  Unlike MacFarlane, Elizabeth did not engage in a clear tax fraud and, moreover, amended her tax return soon after it became public knowledge that The Key Worldwide Foundation did not donate the Henriquezes' $400,000 to the Georgetown Tennis program.  Moreover, MacFarlane utilized the "side door"—which Judge Talwani (and previously the government) deemed substantially more aggravated than the test-cheating scheme—twice, whereas Elizabeth utilized it only once.  And it would create a severe unwarranted disparity to sentence Elizabeth to a longer term of incarceration than business titan Douglas Hodge.  Setting aside that Mr. Hodge (like many wealthy white-collar offenders who control the purse strings of their family's largesse) has donated a significant portion of his immense wealth to philanthropic purposes, he also successfully used Singer's scheme to steal admissions slots for twice as many children (four vs. two) across a period of time at least four times as long (11 years vs. 2.5 years) while paying Singer significantly more money ($850,000 vs. ~$500,000) as compared to Elizabeth.

### D.    Additional Special Sentencing Considerations

In determining the appropriate sentence to impose on Elizabeth, we respectfully request that the Court factor in the following additional considerations:

First, and most significantly, the Bureau of Prisons has acknowledged the serious health crisis that COVID-19 poses to the federal prison population.  It seems unlikely that the crisis will abate any time soon, and even if the COVID-19 pandemic comes under control sometime this summer, public health experts are already warning of a second wave of infections hitting in the fall. █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████.  We respectfully submit that, as a non-violent first-time offender whose advisory Sentencing Guidelines place her squarely in Zone A of the sentencing table,[25] a sentence of thirty months' probation that includes a five-month period of home detention, coupled with a substantial requirement of community service, is the most humane sentence for Elizabeth given the serious (and possibly deadly) health risk that imprisonment would pose to her.  Moreover, given the operational challenges that the COVID-19 crisis is presenting for the Bureau of Prisons, it makes little sense to add a first-time, non-violent offender such as Elizabeth to the current prison population.

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[25] Elizabeth's sentencing table "zone," and therefore her eligibility to receive a sentence of probation with a condition of home detention in lieu of imprisonment, is determined by her "applicable guideline range" as calculated under § 5C1.1 of the Sentencing Guidelines.  *See* U.S.S.G. § 5B1.1.  The Probation Office has correctly calculated Elizabeth's applicable guideline range as calculated under § 5C1.1 to be 0-6 months, which is Zone A.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████ ██████████████████

██████████████████████████████████████

        Fourth, because Elizabeth's husband Manuel also has pled guilty, the Henriquez family has been especially devastated by this ordeal.  Only one other married couple has been sentenced thus far—Greg and Marcia Abbott, each of whom received only one month imprisonment.

---

[26] *See* ████████████████████████████████████████
█████████████████████████████████

Fifth, the government is seeking substantial, above-Guidelines fines for both Elizabeth and Manuel, even though it is undisputed that Elizabeth has no independent source of income and is entirely financially dependent on Manuel. Cumulatively, the government has recommended a fine of $400,000 for the Henriquezes ($250,000 for Elizabeth and $150,000 for Manuel). This is double what the government recommended for Douglas Hodge (who is worth hundreds of millions of dollars) and more than double what the government has recommended for Michelle Janavs (who reportedly is worth billions). There is simply no justification for this. We respectfully submit that, for purposes of a fine, the Court treat Elizabeth and Manuel as a unit, so as not to impose what would amount to double punishment. Accordingly, we respectfully submit that the Court should, at most, impose on Elizabeth a within-Guidelines fine. *See* U.S.S.G. § 5E1.2(c)(3) (Fine Table).

## **CONCLUSION**

As set forth above, Elizabeth Henriquez's offense conduct should, for sentencing purposes, be deemed substantively identical to that of Michelle Janavs. Given the unique aspects of Elizabeth's personal history and characteristics—including especially ███████████ ████████████████████████████████████████████████████████████████ ███████ her track record of unsung decency and kindness—we respectfully request that Elizabeth be sentenced to thirty months' probation, with the initial five months subject to a condition of home detention; a within-Guidelines fine; and a substantial requirement of community service.

DATED: March 26, 2020

Respectfully submitted,

/s/ Aaron M. Katz
Aaron M. Katz (BBO #662457)
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199
(617) 951-7000
aaron.katz@ropesgray.com

Laura G. Hoey (*pro hac vice*)
Ropes & Gray LLP
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
(312) 845-1200
laura.hoey@ropesgray.com

Colleen A. Conry (*pro hac vice*)
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006-6807
(202) 508-4600
colleen.conry@ropesgray.com

**Counsel for Elizabeth Henriquez**

## <u>CERTIFICATE OF SERVICE</u>

I, Aaron M. Katz, hereby certify that the foregoing document was served through the ECF system on all registered participants in this action on March 26, 2020.

*/s/ Aaron M. Katz*_____
Aaron M. Katz
